UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| TINA MARIE THOMPSON, | Case No. 11-CV-3099 (PJS/AJB) |
| Plaintiff, | |
| v. | ORDER |
| ZIMMER INC.; ZIMMER HOLDINGS, INC.; ZIMMER PRODUCTION INC.; ZIMMER US, INC.; and ZIMMER SURGICAL, INC., | |
| Defendants. | |

Matthew J. Schumacher and Stephen J. Randall, PEARSON, RANDALL & SCHUMACHER, P.A., for plaintiff.

M. Joseph Winebrenner, Linda S. Svitak, and James Stephen Bennett, FAEGRE BAKER DANIELS LLP, for defendants.

Plaintiff Tina Thompson was implanted with an artificial hip that had been designed, manufactured, and distributed by defendants Zimmer Inc., Zimmer Holdings, Inc., Zimmer Production Inc., Zimmer US, Inc., and Zimmer Surgical, Inc. (collectively "Zimmer"). Following the implantation, Thompson experienced multiple hip dislocations. Ultimately, Thompson underwent a revision surgery to replace certain components of her Zimmer implant. During the operation, the surgeon discovered that the polyethylene-liner component of the implant was fractured. Thompson now brings claims of failure to warn and design defect against

Zimmer,[1] contending that the fractured liner caused her dislocations and the need for her revision surgery.

This matter is before the Court on three motions: (1) Zimmer's motion for summary judgment; (2) Zimmer's motion to exclude the testimony of Mari Truman under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and (3) Zimmer's motion to partially exclude the testimony of Dr. Thomas Nelson under Rule 702 and *Daubert*. For the reasons stated below, Zimmer's motion for summary judgment is granted and its motions to exclude the testimony of Truman and Dr. Nelson are granted in part and denied as moot in part.

## I. BACKGROUND

On July 6, 2009, Thompson underwent a total left hip replacement at Alaska Regional Hospital to treat avascular necrosis of her left femoral head.[2] Pl.'s SJ Ex. 2; Thompson Dep. 58. Thompson was implanted with a number of components manufactured by Zimmer, including a Trilogy Acetabular System Spiked shell and a Trilogy Acetabular System Longevity Crosslinked

---

[1] Thompson also brought claims of breach of express and implied warranties, manufacturing defect, res ipsa loquitur, and violation of various consumer-protection laws. For the most part, Thompson did not respond to Zimmer's arguments in favor of summary judgment on those claims, and the Court therefore treats those claims as abandoned. Thompson did mention one of her implied-warranty claims in passing, but she treated that claim as identical to her design-defect claim. ECF No. 58 at 23. The Court follows suit. *See Worden v. Gangelhoff*, 241 N.W.2d 650, 651 (Minn. 1976) (noting that the proof required from a plaintiff seeking to recover for injuries from an unsafe product is largely the same regardless of whether he relies on negligence, warranty, or strict liability); *Piotrowski v. Southworth Prods. Corp.*, 15 F.3d 748, 751 (8th Cir. 1994) (while claims for breach of implied warranty of fitness are distinct, claims for implied warranty of merchantability likely merge with strict liability in product-liability cases).

[2] As reflected in her medical records, Thompson was formerly known as Tina Muetz.

Polyethylene liner. Defs.' SJ Ex. 11. These components form the socket portion of the artificial hip, with the polyethylene liner sitting inside the metal shell.

The surgery was performed by Dr. Timothy Kavanaugh. Pl.'s SJ Ex. 2. Dr. Kavanaugh chose a shell with a 56-millimeter outer diameter and a liner with a 36-millimeter inner diameter. Defs.' SJ Ex. 11. Such a liner is considered a large inner-diameter or "large ID" liner. Nelson Dep. 14-15. Dr. Kavanaugh implanted the shell and liner at a 60 to 65 degree abduction angle. Pl.'s SJ Ex. 10 at 22. This was an unusually high angle. As plaintiff's expert Mari Truman explained,

> It has long been known in the orthopaedic community that high acetabular cup inclination angles (above about 55°) result in increased incidence of premature acetabular cup failures which are . . . attributed to increased stress concentrations, edge loading and cup-stem/neck impingement.

Pl.'s SJ Ex. 10 at 33. *See also* Nelson Dep. 38 (agreeing that a high abduction angle can lead to fracturing of the liner).

Thompson was discharged from the hospital with instructions to undergo physical therapy and follow what are known as "hip precautions." Thompson Dep. 70, 104. Thompson's hip precautions included instructions not to flex her hip at an angle greater than 90 degrees and to keep her legs at least a fist-width apart. Thompson Dep. 104-05. The discharge instructions in Thompson's medical records also indicate that she was instructed not to cross her legs, although Thompson does not specifically remember that instruction. Thompson Dep. 104-06.

Thompson's initial recovery from surgery went well. Defs. SJ Ex. 21 (August 2009 medical record noting that Thompson was doing well); Thompson Dep. 114 (agreeing that six weeks post-surgery she was "doing quite well"); Defs.' SJ Ex. 23 (January 2010 medical record

noting that Thompson "has been doing fine with no complaints of the hip"). Beginning in January 2010, however, Thompson suffered a total of six hip dislocations (and one near dislocation) over a period of about four months.

First, on January 20, Thompson suffered a dislocation after she tripped and fell on her hip. Defs.' SJ Exs. 22, 23. Second, on January 30, Thompson dislocated her hip after crossing her legs. Thompson Dep. 125-26. Third, on February 19, Thompson dislocated her hip after she sat down on a curb. Thompson Dep. 133-35. Fourth, on March 7, Thompson dislocated her hip as she tried to rise from a supine position. Thompson Dep. 139-40. Fifth, on April 4, Thompson dislocated her hip as she lifted her foot from a low rung, where she had been resting it. Thompson Dep. 142-43. Sixth, on April 18, Thompson again dislocated her hip as she tried to rise from a supine position. Thompson Dep. 146-47. Finally, on May 14, Thompson went to the hospital because she was experiencing pain and wobbliness. Thompson Dep. 152-54. The hospital took X-rays, but did not otherwise provide any treatment, as Thompson's hip was not dislocated. Thompson Dep. 154-55.

After suffering this series of dislocations (and one near dislocation), Thompson began to experience recurrent hip pain. Thompson Dep. 155-57. She eventually sought treatment with Dr. Thomas Nelson in September 2010. Thompson Dep. 157, 160. Dr. Nelson recommended a hip revision (i.e., replacing some of the components of her artificial hip). Thompson Dep. 155, 163. Thompson had the revision surgery on September 29, 2010 and has not dislocated her hip since. Thompson Dep. 159, 187.

When Dr. Nelson opened Thompson's hip to remove the original implant, he found that the polyethylene liner was fractured posteriorly and observed that when the ball portion of the

joint hit the fracture, it easily dislocated. Pl.'s SJ Ex. 3 at TCO 7; Nelson Dep. 71. He also found that the posterior capsule had torn off the trochanter.³ Pl.'s SJ Ex. 3 at TCO 7. Dr. Nelson acknowledged that he caused further damage to the liner during explantation, but he had difficulty remembering how or where he had damaged the liner. Nelson Dep. 58-61.

## II. ANALYSIS

### A. Standard of Review

#### 1. Summary Judgment

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

#### 2. Fed. R. Evid. 702

Rule 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

³A capsule is a structure of connective tissue that envelopes a joint or organ. *Stedman's Medical Dictionary* 280 (27th ed. 2000).

>(b) the testimony is based on sufficient facts or data;
>
>(c) the testimony is the product of reliable principles and methods; and
>
>(d) the expert has reliably applied the principles and methods to the facts of the case.

*See also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

District courts have wide latitude in deciding whether an expert's testimony is reliable. *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007). In determining whether an expert's testimony is the product of "reliable principles and methods," district courts consider such factors as:

>(1) whether the theory or technique can be (and has been) tested;
>
>(2) whether the theory or technique has been subjected to peer review and publication;
>
>(3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and
>
>(4) whether the theory or technique is generally accepted in the scientific community.

*Smith v. Cangieter*, 462 F.3d 920, 923 (8th Cir. 2006). Because this inquiry is necessarily fact-specific, there is no single requirement for reliability. *See Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). Instead, these factors are flexible and should be adapted or rejected as the case demands. *Id.* The burden of establishing that the proposed testimony is admissible under Rule 702 is on the proponent of the expert opinion. *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006).

B. *Failure to Warn*

Thompson argues that the Zimmer polyethylene liner was defective because Zimmer (1) failed to warn about the risk of liner fatigue and fracture from implanting the device at a high abduction angle and (2) failed to warn of the increased risk of fracturing, particularly in heavy patients, due to the fact that the liner was only 2.2 millimeters thick in the lock-ring region (the indented groove below the rim).

To prevail on a failure-to-warn claim, a plaintiff must show that "(1) the defendant had a duty to warn; (2) the defendant breached that duty by providing an inadequate warning (or no warning at all); and (3) the defendant's inadequate (or nonexistent) warning caused the plaintiff's damages." *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1155 (D. Minn. 2011). Under the learned-intermediary doctrine, a medical-device manufacturer can satisfy its duty to warn by warning the prescribing physician (rather than the patient) about the dangers associated with the device. *Id.* at 1152.

In this case, no reasonable jury could find that Zimmer's failure to warn caused Thompson's damages. Thompson chose not to depose Dr. Kavanaugh, the surgeon who implanted the allegedly defective liner, and who would have been the recipient of the warnings that Thompson contends should have been given.[4] Consequently, there is no evidence that Dr. Kavanaugh would have implanted the acetabular shell at a different angle, or that he would have chosen a different liner, if he had been given those warnings.

---

[4]After the hearing on Zimmer's motions, at which the Court opined that Thompson's failure to depose Dr. Kavanaugh would likely be fatal to her failure-to-warn claim, Thompson sought permission to reopen discovery so that she could depose Dr. Kavanaugh. Chief Magistrate Judge Arthur J. Boylan denied the request because Thompson failed to show good cause to modify the discovery schedule. ECF No. 85. Thompson did not object.

An artificial hip is not a single, integrated device; instead, implanting surgeons choose a combination of modular components based on the risks and benefits to the individual patient. Nelson Dep. 54-55. Without Dr. Kavanaugh's testimony, there is no way for the jury to know why he chose the particular configuration of components that he implanted or why he implanted them at a 60 to 65 degree angle of abduction. It may well be that Dr. Kavanaugh was fully aware of the risks that Thompson says he should have been warned of, and that Dr. Kavanaugh concluded that the benefits of implanting the liner at that particular angle (in conjunction with the other components he chose) outweighed those risks. *Cf.* Pl.'s SJ Ex. 10 at 17 (noting advantages of higher angles for certain types of patient anatomy); Truman Dep. 161-63, 184-85 (noting advantages of larger femoral heads and liners). Simply put, there is no evidence from which a jury could conclude that a warning would have caused Dr. Kavanaugh to do anything differently. *Cf. In re Levaquin Prods. Liab. Litig.*, 700 F.3d 1161, 1168-69 (8th Cir. 2012) (finding evidence of causation sufficient where prescribing physician testified that he would not have prescribed the drug had he known of the risk); *Kapps*, 813 F. Supp. 2d at 1157 (granting summary judgment on a failure-to-warn claim because the plaintiff did not depose the doctor and therefore had no evidence that a warning would have made any difference). The Court therefore grants Zimmer's motion for summary judgment on Thompson's failure-to-warn claim.

### C. Design Defect

To recover on a design-defect claim, the plaintiff must show that the product was defective and unreasonably dangerous and that the defect proximately caused the plaintiff's injuries. *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1009 (8th Cir. 1998); *Patton v. Newmar Corp.*, 538 N.W.2d 116, 119 (Minn. 1995). Determining whether a product is unreasonably

dangerous involves "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 621 (Minn. 1984) (citation and quotations omitted). Except in the "rare case[]" in which a product should be removed from the market rather than redesigned, a plaintiff must ordinarily show that there is a feasible safer alternative design.[5] *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96-97 & n.8 (Minn. 1987); *Young v. Pollock Eng'g Grp.*, 428 F.3d 786, 789 (8th Cir. 2005).

To show that the liner was defective and unreasonably dangerous, Thompson relies on the opinions of Mari Truman, a biomedical engineer with expertise in the fields of biomechanics and orthopedics. Pl.'s SJ Ex. 10 [hereinafter "Truman R."] at 2. Truman opines that the liner is defective and unreasonably dangerous because it has certain design features that make it "susceptible to premature fatigue cracking and rim dissociation, particularly when installed in high abduction angles . . . ." Truman R. 62; *see also* Truman R. 49 (opining that the liner is unreasonably dangerous). These features include a thin lock-ring region; an unsupported rim of polyethylene above the edge of the acetabular shell; vertical notches in the unsupported rim; and sharp corners in the acetabular-cup edge region. Truman R. 62-63. Thompson's theory is that the thin lock-ring allows cracks to initiate and the vertical notches in the unsupported rim allow the cracks to propagate. ECF No. 76 at 9-11.

---

[5]The Court notes that, several times during her deposition, Thompson's expert Mari Truman opined that the liner should either be accompanied by proper warnings or taken off the market. Truman Dep. 109-10; 170. In her briefing, however, Thompson does not contend that the device should be taken off the market; instead, she argues that there are safer alternatives. ECF No. 58 at 25-26. Thompson therefore has the burden of producing sufficient evidence of safer alternatives.

Truman's opinion that the liner is susceptible to premature fatigue cracking and rim dissociation is substantially undermined by evidence of the device's reported fracture rate, however. Out of over 41,000 sales of devices of the same size and type as Thompson's, Zimmer has received only three reports (including Thompson's) of fractures. *See* Defs.' SJ Ex. 18 (2001-2013 sales figures); Defs.' SJ Ex. 19 at 7-8, 9-10 (defendants' responses to interrogatories). This represents a fracture rate of about 0.007 percent.

Thompson contends that this fracture rate is inaccurate because fractures are underreported. As evidence of this underreporting, she points to testimony given by a Dr. Stanley in a different case involving a Zimmer liner.[6] Dr. Stanley testified that he has implanted Zimmer's Trilogy acetabular system about 500 times and has seen a fractured liner 25 or 30 times in his career. Stanley Dep. 127-28. From these figures, Thompson calculates a fracture rate of 6 percent.

But Dr. Stanley was not asked how many fractured *Zimmer* liners he had seen (much less how many fractured Zimmer liners of *Thompson's type and size* he had seen); he was asked how many fractured *polyethylene liners* he had seen. Stanley Dep. 127 ("Do you have an idea of how many times you've seen a polyethylene liner fractured?"). Moreover, Dr. Stanley testified that, although he saw hundreds of hip revisions during his residency, he has not performed many hip revisions in his practice. Stanley Dep. 121-22. It is likely, therefore, that Dr. Stanley saw most of the fractured liners during his residency, which ended in 1999. Stanley Dep. 121. But Zimmer did not obtain FDA approval to market the Trilogy Longevity liner until July 1999 and

---

[6]At the hearing, Thompson also referred to the deposition of Kevin Escapule, who is apparently an employee of Zimmer. ECF No. 76 at 17-18. Escapule's deposition is not in the record, however.

did not begin marketing liners of the size and type implanted in Thompson until late 2000 or early 2001. Defts.' SJ Reply Ex. 3; Truman R. 38. This makes it highly unlikely that Dr. Stanley has seen many fractured Trilogy Longevity liners. Finally, Dr. Stanley's testimony that "we probably underreport" fractured liners, Stanley Dep. 127, is too speculative and impressionistic to establish a higher fracture rate.

In her report, Truman acknowledges that "[t]he reported occurrence of the Trilogy big-head liner fractures is relatively low." Truman R. 59. But Truman discounts the importance of this reported rate by citing the testimony of Steven Humphrey, a Zimmer research engineer.[7] Truman R. 59. According to Truman, Humphrey testified that the rate may not include lawsuits or other cases not reported to Zimmer.[8] That is not exactly what Humphrey said; instead, he testified that he does not know whether Zimmer's database includes lawsuits (such as this one). Humphrey Dep. 424. It is true that Humphrey testified that Zimmer does not know about cases that are not reported to it. Humphrey Dep. 423-24. But, as with Dr. Stanley's testimony, that truism is an extremely slender basis on which to disregard Zimmer's reported fracture rate and, more importantly, provides no basis to calculate a higher fracture rate. Indeed, Truman admitted that she cannot quantify the risk of fracture for the Longevity liner. Truman Dep. 268. The only evidence before the Court, therefore, is evidence that the Longevity liner at issue in this case has a rim-fracture rate of three out of 41,000, or 0.007 percent.

---

[7]Truman incorrectly refers to him as Stephen Humphreys.

[8]Truman also implies that the rate is distorted because Zimmer included all of its devices — not just the type and size of the liner implanted in Thompson — in the ratio. Whether or not that is true for the fracture-rate charts in Truman's report, it is not true for the rate discussed in Zimmer's briefing.

Truman's failure to explain the extraordinarily low reported fracture rate (other than by speculating that it must be inaccurate), coupled with her inability to quantify the risk of fracture, renders her opinion that the device is prone to premature fracture highly questionable. This is particularly true in light of Truman's acknowledgment that she does not know of any liner with a zero percent fracture rate. Truman Dep. 101-02. Indeed, Truman does not identify a single liner with a lower fracture rate than the Longevity liner that was implanted in Thompson. In light of these failures, Truman's opinion that the liner is prone to premature fracture lacks the necessary factual support to be admissible.[9]

Even if Truman's opinion that the liner is prone to premature fracture is admissible, her opinion that there are safer, feasible alternative designs — namely, various later-generation liners already on the market — is not supported by sufficient facts or data. Truman did not identify any fracture rates for other liners, Truman Dep. 271, and (as noted) she is not aware of any liner with a lower fracture rate than the Longevity liner. Nor did Truman conduct fatigue testing on the other liners. Truman Dep. 271.

Truman also did not do any analysis of the possible tradeoffs of a different design. She notes that the alternative liners reduce wear debris, Truman R. 50, but as she admitted during her deposition, wear debris is not an issue in this case, Truman Dep. 272. More significantly, her report includes a table showing the push-out and lever-out tolerances of various liners — that is, the amount of force that it takes to dislodge a liner from the acetabular cup. Truman R. 51; ECF No. 76 at 74-75. The table shows that Zimmer's Trilogy liners have much higher push-out and

---

[9]The Court rejects out of hand Thompson's argument that expert testimony is not necessary for a jury to understand that the thinness of the liner in the lock-ring region renders it prone to fracture. *See* ECF No. 58 at 23-24.

lever-out tolerances than all of the other alternative devices — that is, it would take much more force to dislodge the Longevity liner from the acetabular shell than it would for any of the proposed safer alternatives. Truman R. 51.

These data suggest that whatever advantage the alternative devices gain in reducing the risk of fracture comes at the cost of a higher risk of the liner becoming dislodged from its shell. Truman asserts that the alternative liners should nevertheless have sufficient durability under adverse conditions (such as malpositioning), Truman R. 50, but she identifies no basis for this assertion and admitted during her deposition that she has not tested it, Truman Dep. 273-75. Given this lack of foundation, Truman's opinion that there are safer, feasible alternatives is too speculative to be submitted to the jury. *Cf. Young*, 428 F.3d at 790 ("Testimony may be excluded if an expert fails to explain how a proposed safety modification would protect the machine's operators without compromising the machine's utility."); *Unrein*, 394 F.3d at 1012 ("An expert proposing safety modifications must demonstrate by some means that they would work to protect the machine operators but would not interfere with the machine's utility.").

Finally, Truman's opinion that the fracture in the liner contributed to Thompson's numerous dislocations and created the need for her revision surgery is also speculative. Truman posits that Thompson's January 2010 fall caused the device to fracture due to preexisting cracks that had developed in vivo. Truman Dep. 210, 312. Truman contends that a number of circumstances — such as the fact that Thompson dislocated posteriorly, and the fact that, during some of her later reduction procedures, the doctor noted that her hip would easily re-dislocate during adduction — are consistent with an inference that the posterior fracture in the liner contributed to Thompson's dislocations. Truman Dep. 119-21, 278-79.

But Truman has little if any basis to determine when Thompson's liner became fractured. Nor does Truman have any basis to rule out other possible causes of Thompson's hip dislocations. Truman lacked the necessary information to perform a fall-mechanics analysis of Thompson's fall. Truman Dep. 199-200. Likewise, Truman had no information about Thompson's fifth and sixth dislocations. Truman Dep. 202. In fact, Truman admitted that she does not know *when* the allegedly in-vivo damage occurred, Truman Dep. 308, and she has little if any basis for determining *what* damage occurred in vivo. She admittedly does not know what damage Dr. Nelson caused through his explantation efforts and could only say that she had a "feeling" that certain cracks initiated in vivo and that some of the damage looked "consistent" with in-vivo damage. Truman Dep. 118-19, 129, 134-54, 156-57. Truman admitted that she does not do the kind of failure analysis called for in this case on a routine basis and that it would be better to have a materials-failure expert make a definitive determination. Truman Dep. 122-24.

While it is true that the liner was fractured by the time Dr. Nelson removed it in September 2010, by that time Thompson had also dislocated her hip six times and had then ambulated on it for an additional six months. Truman agreed that the fact that Thompson ambulated on an unstable hip for six months before her revision surgery probably damaged the liner. Truman Dep. 217. Truman also acknowledged that repeated dislocations can damage a liner. Truman Dep. 188-89. Finally, Truman admitted that there are a number of possible causes of hip dislocations *other* than a cracked liner, including trauma, a posterior approach to the implant surgery, failure to follow hip precautions, soft-tissue laxity, soft-tissue damage from one or more previous dislocations, and improper angles of abduction for the implant. Truman

Dep. 183-84, 208. Truman had no basis to rule out these possible causes for the dislocations and damage to the liner; in fact, she agreed that Thompson's failure to follow hip precautions contributed to her dislocations. Truman Dep. 208.

Because Truman cannot determine when or where the damage first occurred to the liner, her opinion that the liner contributed to Thompson's dislocations is not based on sufficient facts or data to be admissible.[10] *Cf. Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1114-15 (8th Cir. 2007) (affirming exclusion of causation opinion where the expert disregarded the need to reconstruct the accident and simply emphasized that the tractor was unsafe without a rollover-protection system); *Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1215-16 (8th Cir. 2006) (affirming exclusion of causation opinion where expert "offered only vague theorizing based upon general principles").

Without Truman's opinions that the liner was prone to premature fracture, that there are safer, feasible alternatives, and that the defect caused Thompson's dislocations, Thompson cannot prevail on her design-defect claim.[11] The Court therefore grants Zimmer's motion for summary judgment on that claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

---

[10]Similarly, Dr. Nelson also admitted that he did not know when or why the liner had fractured. Nelson Dep. 64-65. To the extent Thompson offers Dr. Nelson's testimony to show causation, therefore, his opinion is likewise inadmissible.

[11]Thompson's lack of proof that any defect in the liner caused her dislocations is also fatal to her failure-to-warn claim.

1. Defendants' motions to exclude expert testimony [ECF Nos. 36, 41] are GRANTED IN PART and DENIED AS MOOT IN PART as described above.

2. Defendants' motion for summary judgment [ECF No. 46] is GRANTED.

3. Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 25, 2013
s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge